**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
CENTRAL DIVISION**

| | |
|---|---|
| **JULIAN PRATT WATERMAN ARCHER and JANE GOCHENOUR ARCHER,**<br><br>　　　**Plaintiffs,**<br><br>**v.**<br><br>**STEPHEN A. KENNEDY, KENNEDY LAW, LLP, and KENNEDY LAW, P.C.,**<br><br>　　　**Defendants.** | **Case No. 3:21-cv-00748-N**<br><br>**PLAINTIFFS' SECOND AMENDED COMPLAINT AND JURY DEMAND** |

Pursuant to Fed. R. Civ. P. 15(a)(2), and as allowed by this Court, Plaintiffs submit this Second Amended Complaint and Jury Demand.

## INTRODUCTION

1.　　This is an action alleging that the Defendants committed legal malpractice and made material misrepresentations in connection with legal advice and representation provided by them to the Plaintiffs and that the Plaintiffs sustained substantial damages as a result of that malpractice.

## PARTIES

2.　　Plaintiffs Julian Pratt Waterman Archer and Jane Gochenour Archer ("Plaintiffs") are citizens of Iowa, residing in Polk County, Iowa.

3.　　Defendant Stephen A. Kennedy ("Kennedy") was at all material times a licensed attorney at law in the state of Texas and is a citizen and resident of the state of Texas.

4.    Defendant Kennedy Law, LLP, on information and belief, is a limited liability partnership organized under the laws of the state of Texas with its principal place of business located in the state of Texas.

5.    Defendant Kennedy Law, P.C., on information and belief, is a Texas corporation with its principal place of business located in the state of Texas.

## JURISDICTION AND VENUE

6.    Plaintiffs are citizens of Iowa, residing in Polk County.

7.    Defendants are citizens of Texas.

8.    This Court has removal jurisdiction of this case pursuant to 28 U.S.C. § 1441(a) because the Defendants removed the case to the United States District Court for the Southern District of Iowa which thereafter transferred this case to this Court pursuant to  28 U.S.C. § 1406(a).

9.    Venue in this judicial district is proper under 28 U.S.C. §§ 1441(a) and 1391(b)(2), respectively, because this is the district to which the case was removed and because a substantial part of the events or omissions giving rise to these claims occurred in this district.

## STATEMENT OF FACTS

### Arkansas Bankruptcy Case

10.    Plaintiffs owned Archer, LLC, an Arkansas limited liability company that owned a barn, inn, cottage and land in Fayetteville; Pratt Place Inn, Inc., an Arkansas corporation that operated Pratt Place Inn and the Waterman Archer Cottage; Sassafras Hill Enterprises, Inc., an Arkansas corporation operated Pratt Place Barn; and Sassafras Hill Communications, Inc., an Arkansas corporation that owned a cell tower site leased by Verizon (collectively, the "Archer Related Entities").  The land owned by Archer, LLC upon which the barn, inn, and cottage were

2

situated was a 72 acre Planned Zoning District (PZD) which included 68 acres for the inn, barn and cottage business, the Archer 4.1 acre homestead property (the "4 acres"), as well as a 2.4 acre 4lot lot-split subdivision (the "Halsell Lots").  The Halsell Lots were under contract to be sold once certain improvements were made pursuant to zoning requirements.  Plaintiffs also personally owned a separate 72-acre non-PZD R-4 parcel (the "R-4 Parcel").  The aforementioned land is collectively hereinafter referred to as the "Properties".  The cell phone tower subject to lease is located on separate acreage.  Additionally, the Plaintiffs owned property in Iowa and Paris, France; horses; and personal items, including antique furnishings, that were or still are located in Pratt Place Inn, Pratt Place Barn, Pratt Place Cottage, and two storage sheds.

11.     In approximately March 2014, the Plaintiffs received a foreclosure notice from Simmons Bank for a two-month delinquency on a building loan secured by the Properties. Consequently, Plaintiffs sought legal advice from attorney Stanley Bond and his law firm (collectively, "Bond"), an Arkansas attorney reputed to be an experienced debt relief bankruptcy attorney, to determine their financial options and best solution to their financial problem.

12.     Bond advertised himself in his website as "one of the most trusted Chapter 11 Bankruptcy attorneys in the state" and asserted his belief that "bankruptcy law firms should take responsibility for teaching their clients about what they can expect throughout their Chapter 7, 11, 12 or 13 bankruptcy".  These statements were central factors in Plaintiffs' decision to engage Bond as legal counsel.

13.     After consultation with Bond, Plaintiffs retained Bond to assist them in avoiding foreclosure by Simmons Bank based on the claimed default in the obligations owed to that bank, which Bond referred to as a "technical default".

14.    Upon legal advice from Bond, Plaintiffs caused Archer LLC and Sassafras Hill Communications Inc. to each file a Chapter 11 bankruptcy proceeding on April 21, 2014.

15.    Bond failed to properly ascertain the terms of the note/debt that Simmons Bank held and was attempting to foreclose, and they failed to realize that the defaulting loan was in fact cross-collateralized and/or guaranteed by Pratt Place Inn, Inc. and Sassafras Hill Enterprises, Inc., as well as personally guaranteed by the Plaintiffs in their individual capacities.  After Archer, LLC and Sassafras Hill Communications Inc. filed Chapter 11, Simmons Bank in turn began collection efforts against all remaining parties not in bankruptcy, including the Plaintiffs.

16.    Consequently, on advice of Bond, Pratt Place Inn, Inc. and Sassafras Hill Enterprises, Inc. filed for Chapter 11 on January 15, 2015, and the Plaintiffs personally filed for Chapter 11 on April 28, 2015. Bond initially represented Plaintiffs and the separate debtors for all five bankruptcies.  The Court later ordered Pratt Place Inn, Inc. and Sassafras Hill Enterprises, Inc. to seek separate counsel, which they did although still under Bond's guidance.

17.    Bond's representation of Plaintiffs resulted in many acts of legal malpractice at varying stages of the bankruptcy process that spanned years in duration.  Those acts of malpractice included, but were not limited to the following:

      a.    Bond failed to properly prepare Plaintiffs' bankruptcy petition and schedules by failing to list certain assets, including horses; a garage and an apartment in Paris, France; furnishings inside the Inn, many of which were antique family heirlooms; bank accounts; and other assets.

      b.    Bond knew of the existence of the undisclosed assets and knew that the Plaintiffs incorrectly believed they were required only to list assets sufficient to cover their debt obligations. Despite that knowledge, Bond failed to properly

advise Plaintiffs of the requirements to disclose all assets and the potential consequences for the failure to do so.

c.  Bond failed to properly file claims of exempt assets, with the result that many of Plaintiffs' personal assets eventually became part of their bankruptcy estate and subject to liquidation to satisfy creditor debts.

d.  Bond neglected many important procedural requirements that must be strictly adhered to maintain a Chapter 11 bankruptcy proceeding. Bond's lack of attention to detail and failure to ensure procedural compliance caused Plaintiffs, who had no prior bankruptcy experience or knowledge, to breach certain procedural requirements that should have been avoided with proper oversight and direction by Defendants.

e.  Bond repeatedly failed to assert meritorious challenges to proposed actions of the bankruptcy Trustee which were detrimental to Plaintiffs.

18.     As a consequence of Bond's neglect, a Motion to Convert to Chapter 7 or in the Alternative Appoint a Chapter 11 Trustee (the "Motion to Convert") was ultimately filed in Plaintiffs' case by the United States Trustee ("UST") on March 7, 2016. Bond did not take any effective steps to oppose that motion and an Order was entered on May 12, 2016 involuntarily converting Plaintiffs' personal bankruptcy from a Chapter 11 proceeding to a Chapter 7 liquidation case, thereby exposing virtually all of Plaintiffs' assets to complete liquidation to pay off creditor debts.

19.     Prior to the above noted Chapter 7 sale/liquidation and in reaction to the Trustee's initial stance that the barn, inn and cottage were harming the estate by performing at a deficit, Plaintiffs employed a CPA to scour the books, and records of these entities to properly underwrite

5

their financial health.   In January 2016, Plaintiffs provided the Trustee updated financial documentation performed by this CPA evidencing the barn, inn and cottage were not a detriment to the estate, and that they were in fact financially secure.  The Trustee refused to consider these updated financials due to Bond's continuous procedural miscues and associated negligence throughout the bankruptcies and elected to proceed with the sale of the barn, inn, cottage, 68-acres, 4-acres and associated assets at a steep discount.  Bond neglected to challenge or question, via Motion or otherwise, the Trustee's assertion that the assets in question were not profitable and should be sold.  As a result, Plaintiffs, to their detriment, lost valuable and personal assets at sales well below market value.

20.     In December 2015, Plaintiffs had originally listed the R-4 Parcel for sale through their Chapter 11 Bankruptcy as debtors-in-possession and secured an offer of $1,087,050 from Mr. Seth Mims ("Mims"), a local real estate developer.  Plaintiffs' intent, as debtors-in-possession, was to use the proceeds from the R-4 Parcel sale and approximate $250,000 profit from the sale of the Halsell Lots to drastically pay down the Simmons debt and in turn have Legacy Bank refinance the remainder of the debt due and payoff Simmons in full.  Legacy Bank is a local bank that was in close communication with Plaintiffs and agreeable to the deal.  Discussions were also underway for Mims to purchase the 68-acres owned by Archer, LLC, which would have given him the land encompassing the Halsell Lots and on which the Barn, Inn and Cottage were located. Since the City of Fayetteville required two access points to property as large as Mims would be purchasing, the Plaintiffs agreed to grant him, without charge, the choice of one of two potential access easements across the 68-acres from the R-4 Parcel he was buying, with the understanding that the Plaintiffs wished to retain management of the Barn, Inn and Cottage and potentially repurchase the property on which they were located.  Mims not only assured he was agreeable to

6

these terms but offered to look for a financier to lend funds to Plaintiffs to facilitate this repurchase. Soon thereafter, however, Mims placed a $2,000,000 offer on the 68-acres, which was well below market value. The Trustee accepted the offer pursuant to its discretion and scheduled a hearing for Court approval for the sale of all Properties in early February 2016. Shortly afterwards, Mims stopped all communications with Plaintiffs.

21.    Meanwhile, in a last-ditch effort to prevent the sale of these valuable and personal 68-acres (including the Barn, Inn, Cottage, and valuable personal effects), Plaintiffs secured four written offers for the purchase of Sassafras Hill Communications, Inc. and its cell tower lease – two of the offers were over $1,000,000. This $1,000,000 along the $1,087,050 for the R-4 Parcel and $250,000 for the Halsell Lots would have more than paid Simmons in full and enabled Plaintiffs to potentially exit bankruptcy. These four offers were turned over to Bond with the expectation that the pending motion for approval of sale would be challenged by Bond so that Plaintiffs could pay their debt by other means, keep their 68-acres and associated personal and valuable assets, and exit bankruptcy. Bond did nothing. No motion or objection was ever filed although it should have been.

22.    Bond's malpractice thus enabled the Trustee to sell the Properties unnecessarily and without obtaining any appraisals or seeking competitive bids and Mims was thereby able to buy them at a steep discount.

23.    The harm to Plaintiffs resulting from the sale of their assets was compounded by Bond's failure to properly claim exemptions on Plaintiffs' behalf, thereby exposing those assets to sale as well.

24.    Furthermore, due to Bond's failure to properly disclose Plaintiffs' personal assets in their Chapter 7 bankruptcy, the UST filed an Adversary Complaint to Deny Discharge on August

19, 2016.  The discharge was denied.  In effect, the Plaintiffs lost their desired property and valuable personal belongings when this should have been avoided, and they did not even receive a discharge or other protection from the bankruptcy, leaving them in a worse position from when they originally sought competent legal consultation from Bond.

25.    Had Bond ensured complete disclosure and full compliance with all Chapter 11 requirements at the outset and thereafter, the various Chapter 11 cases would not have been converted to Chapter 7 liquidations and Plaintiffs would not have been denied a discharge.

26.    Plaintiffs relied upon Bond's promises, asserted skills and expertise to their detriment.

27.    Bond owed a duty of care and competent representation to the Plaintiffs and his acts and omissions as alleged herein breached that duty.  As a result, the Plaintiffs lost all their Arkansas property in bankruptcy with the exception of Sassafras Hill Communications. This lost property was owned by Plaintiffs personally and not by corporate or other entities. Their lost property disposed of in the bankruptcy and their related damages sustained due to Bond's negligence and fault included, without limitation:

| | |
|---|---|
| Archer, LLC value | $1,038,635 |
| Log house and 4.1 acres | $ 445,000 |
| Inn furnishings | $ 545,000 |
| Personal property | $ 238,990 |
| Private Club Permit | $ 5,000 |
| Kioti tractor | $ 5,500 |
| Golf cart | $ 3,500 |
| Four horses | $ 4,000 |
| 16 foot trailer | $ 400 |
| Legal fees paid to Bond | |
| Fees in bankruptcy | |

28.     Bond's negligence and Plaintiffs' resulting losses and damages occurred in Arkansas. The bankruptcy cases were venued in Arkansas and most of the property lost due to Bond's negligence was located in Arkansas.

### Defendants' Malpractice

29.     The Defendants were the attorneys for the Plaintiffs during approximately the period July 2017 until January 2019. They represented and advised Plaintiffs about legal matters and claims surrounding damages and loss of property sustained by Plaintiffs in Arkansas and contemplated litigation of a legal malpractice suit against Bond.

30.     As Defendants would have been aware, during the period of their representation of Plaintiffs, the Defendants were the only attorneys representing Plaintiffs on those matters.

31.     In July 2017, the Defendants formally agreed to represent Plaintiffs. This was confirmed in Defendants' written engagement letter to Plaintiffs.

32.     Among the principal matters ultimately covered by the Defendants' engagement was a planned legal malpractice suit against Bond.

33.     In the course of Defendants' work for Plaintiffs, Defendants advised Plaintiffs that they had meritorious claims against Bond and they recommended that Defendants pursue those claims.

34.     Defendants offered to litigate the claims against Bond.

35.     Based on Defendants' advice, Plaintiffs instructed Defendants to initiate suit against Bond for malpractice and Defendants agreed to do so.

36.     Defendants provided extensive advice to Plaintiffs over time regarding jurisdictional options for the suit against Bond and various considerations regarding statutes of

limitations in those jurisdictions. The jurisdictions Defendants recommended were Arkansas and Iowa. In 2017 and thereafter Defendants promised to Plaintiffs that they would timely file and prosecute a lawsuit against Bond for malpractice in the courts of whichever of those jurisdictions was appropriate as determined by Defendants in the exercise of their professional judgment.

37.    By at least as early as December 2017, Defendants informed Plaintiffs that Defendants would file suit against Bond in court in Iowa, explaining that there were strategic benefits to filing in Iowa. Although unknown to Plaintiffs at the time, this advice was erroneous as Defendants knew or should have known.

38.    At Defendants' encouragement, in December 2017 and January 2018 Plaintiffs undertook efforts on Defendants' behalf to identify local counsel in Iowa who would be able to assist Defendants in Defendants' role as Plaintiffs' lead litigation counsel in Iowa.

39.    Plaintiffs researched the matter and provided Defendants with names of local counsel candidates.

40.    Defendants specifically asked Plaintiffs to have one particular candidate, an expert in bankruptcy law, call Defendants on the phone to discuss the matter.

41.    Defendants continued through much of 2018 with their misguided plan to file the suit in Iowa. For example, Defendant Stephen Kennedy sent Plaintiffs an email on June 26, 2018 in which he said "we will need to file any lawsuit in Iowa" and referred to "our strategy of filing suit in Iowa…."

42.    On September 19, 2018, Defendant Kennedy informed Plaintiffs that he then believed it was more advisable to file suit in Arkansas based on input he was by then receiving from other attorneys to the effect that there might not be personal jurisdiction over Bond in Iowa.

43.    To Plaintiffs' detriment, Defendants failed to live up to their statements and

commitments that they would file suit against Bond in Iowa as well as their overall promise and commitment to timely file such suit in whatever jurisdiction was appropriate.

44.    During the entire period of Defendants' representation of Plaintiffs, Defendants billed Plaintiffs for required retainers and hourly charges and Defendants paid those retainers and fees with checks sent from Iowa.

45.    During the time they represented Plaintiffs, Defendants failed to initiate suit against Bond within the time limits required under the applicable three-year statute of limitations under Arkansas law despite the fact that meritorious suit could have been brought on those claims in a timely manner in Arkansas.

46.    As a result of Defendants' failure to initiate timely suit against Bond in Arkansas or elsewhere, Plaintiffs' subsequent efforts to recover damages from Bond through litigation were substantially frustrated and limited by Bond's asserted defenses based on expiration of the Arkansas statute of limitations.  Due in substantial part to those defenses, and the Arkansas federal court's recognition of their merit as to some of Plaintiffs' claims, the Plaintiffs recovered less money in that litigation than they would have recovered but for Defendants' negligence and other wrongs.

47.    Defendants made misrepresentations to Plaintiffs regarding available jurisdictions in which they could litigate their claims against Bond and regarding the statutes of limitation applicable to those claims. Specifically, but without limitation, Defendant Stephen Kennedy falsely stated to the Plaintiffs on June 26, 2018 that "we will need to file any lawsuit in Iowa." This statement was made falsely and negligently because, as later acknowledged by Kennedy, Iowa courts would have had no jurisdiction. Kennedy, as a trained attorney, either knew that this representation was false or he recklessly disregarded its falsity.  In addition, on September 19,

11

2018, Kennedy advised Plaintiff that he had "found a way around the statute of limitations issue in Arkansas that favors us." That statement also was false and Kennedy either knew it was false or he recklessly disregarded its falsity.

48.    Defendants made misrepresentations to Plaintiffs regarding whether litigation had been, or was about to be, initiated against Bond.  Specifically, but without limitation, Kennedy falsely stated to Plaintiffs on October 30, 2018 that "[y]our lawsuit against Mr. Bond should have been filed today. If not, it will be filed tomorrow." These statements were false, or made with reckless disregard of their falsity since Kennedy certainly would have known the fact that suit was not filed and was not to be filed.

49.    Plaintiffs relied to their detriment on the truth of Kennedy's false statements by, among other things, continuing to retain and pay him and his firm as their legal counsel rather than seeking alternative competent counsel who would have timely filed suit and by otherwise expending time and money in support of Kennedy's commitment to file suit.

50.    In addition, Plaintiffs were substantially damaged by their reliance on Kennedy's false statements because many of their claims against Bond were not timely filed under the applicable Arkansas three-year statute of limitations and, consequently, Plaintiffs' subsequent efforts to recover damages from Bond through litigation were substantially frustrated and limited by Bond's asserted defenses based on expiration of the Arkansas statute of limitations.  Due in substantial part to those defenses, and the Arkansas federal court's recognition of their merit as to at least some of Plaintiffs' claims, the Plaintiffs recovered less money in that litigation than they would have recovered but for Defendants' misrepresentations.

51.    Defendants' negligence was significantly connected to Arkansas and Iowa, and not to Texas. Defendants promised to represent Plaintiffs in those jurisdictions and failed to file suit

in either. Plaintiffs' resulting losses and damages are significantly comprised of the lost opportunity to recover damages in Arkansas in the lawsuit against Bond based on Bond's negligence committed in Arkansas. Plaintiffs also sustained losses in the form of legal fees and other expenses incurred by them in Iowa.

## STATEMENT OF CLAIMS

### Count I - Negligence

52.    Plaintiffs reallege and incorporate herein by reference the allegations set forth in Paragraphs 1 through 51 above.

53.    Defendants' owed Plaintiffs a duty to exercise ordinary skill, care, and knowledge in their provision of professional services to Plaintiffs.

54.    Through negligence and otherwise, Defendants breached their duties owed to Plaintiffs.

55.    As a proximate result of Defendants' breach of duty, Plaintiffs have each sustained injuries, losses, and damages including but not limited to loss of property, loss of income, emotional distress, and expenditure of legal fees. Without limitation, those damages also included monetary losses sustained when Plaintiffs' efforts to recover damages from Bond through litigation were substantially frustrated and limited by Bond's asserted defenses based on expiration of the Arkansas statute of limitations.

56.    Plaintiffs are each entitled to judgment against Defendants in amounts fully sufficient to compensate them for their injuries and damages.

WHEREFORE Plaintiffs each pray for a money judgment against Defendants, jointly and severally, in such amount as will fully and fairly compensate them for their injuries and damages, for costs of this action, and for such further relief as the Court may deem proper in the premises.

**Count II – Breach of Contract**

57.     Plaintiffs reallege and incorporate herein by reference the allegations set forth in Paragraphs 1 through 56 above.

58.     Defendants' agreement to represent and provide legal services to Plaintiffs was a contract pursuant to which Defendants, either expressly or impliedly, agreed to exercise ordinary skill, care, and knowledge to protect Plaintiffs' interests.

59.     Defendants breached their contract with Plaintiffs by failing to file suit against Bond as agreed and by failing to give knowledgeable and accurate information and advice on tne legal matters they were engaged to handle.

60.     Plaintiffs performed under the contract by paying legal fees to the Defendants.

61.     As a proximate result of Defendants' breach of contract, Plaintiffs have each sustained injuries, losses, and damages including but not limited to loss of property, loss of income, emotional distress, and expenditure of legal fees.  Without limitation, those damages also included monetary losses sustained when Plaintiffs' efforts to recover damages from Bond through litigation were substantially frustrated and limited by Bond's asserted defenses based on expiration of the Arkansas statute of limitations.

62.     Plaintiffs are each entitled to judgment against Defendants in amounts fully sufficient to compensate them for their injuries and damages.

WHEREFORE Plaintiffs each pray for a money judgment against Defendants, jointly and severally, in such amount as will fully and fairly compensate them for their injuries and damages, for costs of this action, and for such further relief as the Court may deem proper in the premises.

## Count III – Fraudulent Misrepresentation

63.     Plaintiffs reallege and incorporate herein by reference the allegations set forth in paragraphs 1 through 62 above**.**

64.     Defendants made intentional and/or knowing false representations to Plaintiffs respecting various matters material to options available to them in pursuing their claims against Bond.

65.     Plaintiffs relied to their detriment on the truth of the representations made to them by Defendants.

66.     As a proximate result of Defendants' false representations, Plaintiffs have each sustained injuries, losses, and damages including but not limited to loss of property, loss of income, emotional distress, and expenditure of legal fees. Without limitation, those damages also included monetary losses sustained when Plaintiffs' efforts to recover damages from Bond through litigation were substantially frustrated and limited by Bond's asserted defenses based on expiration of the Arkansas statute of limitations

67.     Plaintiffs are each entitled to judgment against Defendants in amounts fully sufficient to compensate them for their injuries and damages

68.     Defendants' acted recklessly and with willful and wanton disregard of Plaintiffs' rights and known interests in making false representations to Plaintiffs.

WHEREFORE Plaintiffs each pray for a money judgment against Defendants, jointly and severally, in such amount as will fully and fairly compensate them for their injuries and damages, for an award of punitive damages, for costs of this action, and for such further relief as the Court may deem proper in the premises.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues triable to a jury in this action.


/s/ William W. Graham
William W. Graham
ISBA# 1890
wwgraham@duncangreenlaw.com
**DUNCAN GREEN, P.C.**
400 Locust Street, Suite 380
Des Moines, Iowa 50309
Telephone: (515) 288-6440
Facsimile: (515) 288-6448
(Pro Hac Vice)

-and-


/s/ Jesse Clouse
Jesse Clouse
Texas Bar No. 24105614
jclouse@clousebrown.com
**CLOUSE BROWN PLLC**
1201 Elm Street, Suite 5250
Dallas, Texas 75270-2142
Telephone: (214) 698-5100
Facsimile: (214) 481-8881
**ATTORNEYS FOR PLAINTIFFS**

16